**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

**UNITED STATES OF AMERICA**                                          **PLAINTIFFS**

**V.**                              **CASE NO. 5:21-CV-5012**

**SAM SHANNON WEATHERS;
MELISSA SUE WEATHERS;
CADLEROCK JOINT VENTURE, LP;
BENTON COUNTY COLLECTOR'S OFFICE;
STATE OF ARKANSAS DEPARTMENT OF
FINANCE AND ADMINISTRATION;
ESTATE OF L. ELAINE FOWLER, Deceased;
FRANK C. FOWLER, Individually
and as Executor of the Estate of L. Elaine Fowler;
and STEPHEN R. FOWLER, Individually
and as Executor of the Estate of L. Elaine Fowler**               **DEFENDANTS**

<u>**MEMORANDUM OPINION AND ORDER**</u>

Before the Court are two ripe motions.  The first is a Motion for Partial Summary

Judgment (Doc. 47) filed by Separate Defendant Cadlerock Joint Venture, LP.   The

second is a Motion for Partial Summary Judgment (Doc. 62) filed by Plaintiff the United

States of America.  Both Motions were fully briefed, and they are now ready for decision.[1]

For the reasons explained herein, both Motions are **GRANTED**.

---

[1] In ruling on Cadlerock's Motion (Doc. 47), the Court considered Cadlerock's Brief in
Support (Doc. 48) and Statement of Facts (Doc. 49); Separate Defendants Estate of L.
Elaine Fowler, Frank C. Fowler, and Stephen R. Fowler's Response in Opposition (Doc.
70), Brief in Support (Doc. 71), Statement of Facts (Doc. 72), and Affidavit (Doc. 73); the
United States' Response in Opposition (Doc. 74) and Statement of Facts (Doc. 75);
Separate Defendant Melissa Sue Weathers's Response in Opposition (Doc. 76); and
Cadlerock's Reply (Doc. 87).  In ruling on the United States' Motion (Doc. 62), the Court
considered the United States' Statement of Facts (Doc. 63) and Brief in Support (Doc.
64); Separate Defendant Melissa Sue Weathers's Response in Opposition (Doc. 78);
Separate Defendant Sam Shannon Weathers's Response in Opposition (Doc. 91),
Statement of Facts (Doc. 92), and Response to Statement of Facts (Doc. 93); and the
United States' Reply (Doc. 97).

## I.   BACKGROUND

On January 19, 2021, the United States filed a complaint (Doc. 2) stating various claims for unpaid federal income taxes.  On August 30, 2021, the United States filed an Amended Complaint (Doc. 34) requesting the following relief: (1) judgment as to certain federal income tax, interest, and penalty assessments made against Defendants Sam and Melissa Weathers, jointly, for tax years 2009–2014; (2) judgment as to certain federal income tax, interest, and penalty assessments made against Sam individually for tax year 2015; (3) judgment as to certain payroll tax withholdings and penalty assessments made against Sam as responsible officer of Hazardous Materials, Emergency Response & Training, Inc. ("Haz-MERT"), for the quarterly tax periods ending March 31, 2007–March 31, 2009; and (4) enforcement of federal tax liens encumbering Sam and Melissa's primary residence at 5401 South 44th Street in Rogers, Arkansas.

In addition to naming Sam and Melissa as Defendants, the United States identified certain other parties who may claim an interest in the Weathers's primary residence: (1) Cadlerock; (2) the Benton County Collector's Office ("BCCO"); (3) the State of Arkansas Department of Finance and Administration ("DFA"); and (4) the Estate of L. Elaine Fowler, Deceased, Frank C. Fowler, Individually and as Executor of the Estate of L. Elaine Fowler, and Stephen R. Fowler, Individually and as Executor of the Estate of L. Elaine Fowler (collectively, "the Fowlers").

### A.   Facts Related to Cadlerock's Motion

Cadlerock's Motion for Partial Summary Judgment asks the Court to find as a matter of law that Cadlerock is the first-priority lienholder with respect to Sam and Melissa's real property and primary residence located at 5401 South 44th Street in

Rogers, which is the subject of Count IV of the Amended Complaint. Cadlerock obtained a consent judgment against Sam and Melissa in the Circuit Court of Benton County, Arkansas, on June 30, 2009, in the amount of $71,090.52, plus interest accruing at a rate of 6.00% per year. *See* Doc. 47, pp. 6–8. Under Arkansas law, the lien was valid for a period of ten years but could be revived or extended for successive ten-year periods. *See* Ark. Code Ann. § 16-65-501. It is undisputed that on April 18, 2019, more than two months prior to the expiration of the lien, Cadlerock commenced lien revival proceedings in the Circuit Court of Benton County. The clerk of court issued a writ of *scire facias* that day, requiring Sam to appear and show cause as to why Cadlerock's lien should not be revived. *See* Doc. 47, pp. 20–23.[2]

Cadlerock did not serve Sam with the writ until July 14, 2019—14 days after the ten-year revival deadline had expired. *See id.* at p. 24. On September 4, 2019, the Circuit Court of Benton County issued an order reviving Cadlerock's lien judgment against Sam. The order noted that the judgment was continued for another ten-year period, up to and including June 30, 2029. *Id.* at pp. 24–26. The Fowlers contend Cadlerock's lien was not revived in time. The United States argues that Cadlerock's lien was revived only because state law allowed the order of revivor to relate back to the original judgment, and "state relation back principles [do] not apply to federal tax liens." (Doc. 74, p. 10).

Cadlerock's 2009 lien on Sam and Melissa's home in Rogers predates any other tax lien on the property. The Fowlers registered a judgment against Sam (in personam) and Melissa (in rem only) in 2011. (Doc. 73-1, pp. 2–19). The Fowlers' judgment lien

---

[2] At that point, Cadlerock's lien judgment was only enforceable against Sam. Melissa filed for Chapter 7 bankruptcy in 2009, and Cadlerock's lien against her was discharged as part of that proceeding.

was revived on February 11, 2020. (Doc. 73-4). The earliest date the United States filed a lien encumbering Sam and Melissa's home was in 2013. *See* Doc. 47, p. 27.

The United States offers a second theory as to why Cadlerock is not first in line. According to the United States, the homestead exemption under Arkansas law, Ark. Code Ann § 16-66-210, operates to shield Sam and Melissa's home from the liens of all lienholders *except the United States*. The United States acknowledges, however, that Sam and Melissa have not affirmatively invoked their entitlement to a homestead exemption, either in this suit or any other proceeding. Nevertheless, the United States contends that Arkansas law does not require a taxpayer to take any action to affirmatively invoke his or her right to the homestead exemption. Stated differently, the United States argues it should simply be assumed that Sam and Melissa have asserted their right to a homestead exemption and have, in fact, claimed that exemption. If the United States is wrong about their automatic-exemption theory, though, its alternative argument is that the law allows it to step into Sam and Melissa's shoes and claim the exemption on their behalf.

### B.    Facts Related to the United States' Motion

The United States asks the Court to make two findings as a matter of law. First, the United States requests dismissal of Melissa's innocent spouse defense under 26 U.S.C. § 6015. Second, the United States asks the Court to find Sam liable under Count III of the Amended Complaint for failure to remit Haz-MERT's payroll taxes for the quarterly tax periods ending March 31, 2007, through March 31, 2009.

Regarding Melissa's affirmative defense, the United States argues that though a spouse may qualify for relief from joint and several liability on marital tax debts, such relief

is only available if the spouse first presents an administrative claim to the Internal Revenue Service ("IRS") within two years of the date on which the IRS began collection activity.  It is undisputed that Melissa filed no such administrative claim before the IRS for innocent spouse relief. But even if she had, the United States maintains that the United States Tax Court would have exclusive jurisdiction to decide Melissa's entitlement to such relief, and this Court would be without jurisdiction to weigh in.

Melissa responds that when the United States filed this case, this Court assumed jurisdiction over all substantive claims and defenses raised by the parties—including her affirmative defense under § 6015.  Melissa also argues that § 6015 does not vest exclusive jurisdiction in the Tax Court and that she is not time-barred from asserting the defense in this case.  In the alternative, if the Court decides Melissa should have pursued her § 6015 defense before the IRS and the Tax Court before asserting it here, she asks this Court to bifurcate and stay all claims against her.  Doing so would allow her time to pursue her § 6015 defense in the proper forum and receive a ruling before proceeding in this Court.

Next, with regard to Sam's alleged failure to pay Haz-MERT's payroll taxes under § 6672, the United States argues there is no genuine, material dispute as to Sam's liability.  Sam responds that factual disputes remain as to whether he was "responsible" for failing to pay the taxes, per the statute, or whether such failure was "willful."  He also contends that the IRS misapplied some of Haz-MERT's tax payments, which would make Sam liable for less than the tax penalty the United States has calculated (if he is liable at all).

## II.    LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  On such a motion, the Court reviews the facts in the light most favorable to the opposing party and gives that party the benefit of any inferences that can be drawn from those facts.  *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1997).  The moving party bears the burden of proving that no genuine dispute of material fact exists and that it is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l Bank of Commerce of El Dorado v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999).

If the moving party meets its burden, the non-moving party must then "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)).  However, "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient" to survive summary judgment.  *Anderson v. Durham D&M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  The non-moving party must instead produce sufficient evidence "such that a reasonable jury could return a verdict" in their favor.  *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Liberty Lobby*, 477 U.S. at 248).

6

### III.     DISCUSSION

### A.     Cadlerock's Motion

#### i.     *Scire Facias*

For the reasons explained below, the Court finds that Cadlerock's 2009 lien on the real property described in Count IV has a first-priority status over the United States' 2013 lien and the Fowlers' 2011 lien.  Under Arkansas law, liens on real property "shall continue in force for ten (10) years from the date of judgment and may be revived under § 16-65-501." Ark. Code Ann. § 16-65-117(d)(1).  Cadlerock's lien was set to expire on June 30, 2019, but on April 18, 2019, before the deadline, Cadlerock "sued out" a writ of *scire facias* to revive the judgment.  *See* Ark. Code Ann. § 16-65-501(a) (explaining process for reviving a judgment).  Cadlerock served Sam with the writ on July 14, 2019, and the Circuit Court of Benton County issued the order of revivor on September 4, 2019, which extended the life of the judgment another ten years, until June 30, 2029.

Arkansas' ten-year statute of limitations on judgments is governed by the date the writ is issued, and not the date the order of revivor is entered.  *Bohnsack v. Beck*, 294 Ark. 19, 21 (1987). It is black letter law that the order of revivor relates back to the issuance of the *scire facias*.  Issuing the writ "continues the lien of the judgment without lapse." *Waldstein v. Williams*, 142 S.W. 834, 835 (Ark. 1912).  The Fowlers' suggestion that Cadlerock took too long to serve the writ, thus rendering the order of revivor void *ab initio*, is meritless.  Arkansas places no time limit on serving a writ of *scire facias*, and Arkansas Rule of Civil Procedure 4(i), which sets forth time limits on serving a summons and complaint, does not govern such writs.  *See id.* at 20. ("A writ of *scire facias* is not the commencement of an action and, therefore, Rule 4(i) was not intended to govern.").

Therefore, since "[t]he *scire facias* issued by the clerk start[s] the process of reviving the judgment[,] from that date, rights, if any, are fixed. Interested parties are on notice from that date." *Id.* at 21. In other words, Cadlerock's right to revive the lien judgment for another ten years became "fixed" on April 18, 2019, the date the writ of *scire facias* was issued.

Even though Cadlerock's lien was validly renewed for another ten years, and even though issuing a writ of *scire facias* "continues the lien of judgment without lapse," *Waldstein*, 142 S.W. at 835, the United States argues it is ahead of Cadlerock in priority status *simply because* Cadlerock's lien was renewed.  In other words, the United States argues that because the order of revivor was entered *nunc pro tunc* to the date of the writ of *scire facias*, the order is only valid because it "relates back" to an earlier date of attachment, and any judgment that relies on the doctrine of "relation back" is inferior to a tax lien properly perfected by the United States.  As will be explained in further detail below, this "relation back" argument is specious; the caselaw cited in the United States' brief does not support this argument.

The primary case the United States relies on is *United States Security Trust & Savings Bank of San Diego*, 340 U.S. 47 (1950).  This case concerned a creditor's attachment lien that was described by the state court as "inchoate." *Id.* at 50.  "The attachment lien g[ave] the attachment creditor no right to proceed against the property unless he g[ot] judgment within three years or within such extension as the statute provide[d]." *Id.*  By contrast, Cadlerock's lien was perfected to a final judgment and is choate under Arkansas law.  Thus, *Security Trust* does not stand for the proposition that "state relation back principles do[] not apply to federal tax liens," as the United States

contends.  (Doc. 74, p. 10).  The *Security Trust* Court never discussed whether the creditor's lien "related back" to an earlier date of attachment because the creditor *never perfected a lien to begin with*; "[h]e had a mere 'caveat of a more perfect lien to come.'" *Id.* (quoting *People of State of New York v. Maclay*, 288 U.S. 290, 294 (1933)).

The other cases the United States cites in support of its "relation back" argument are similarly inapposite.  *In re Haas v. IRS* is an Eleventh Circuit case in which the IRS argued "that the Treasury Regulations forbid application of a relation back principle to award *an unperfected lien* priority over the tax lien." 31 F.3d 1081, 1091 (11th Cir. 1994), (emphasis added).  As for *United States v. Ultra Dimensions*, that case involved a priority dispute between the United States' tax lien and *an inchoate lien*. 803 F.Supp.2d 596, 598–601 (E.D. Tex. 2011).  Cadlerock's judgment lien, by contrast, was properly perfected and choate in 2009 and has not lapsed since then.

### ii.    Homestead Exemption

As for the United States' argument that the Arkansas Homestead Exemption Act shields Sam and Melissa's home from Cadlerock's judgment lien, the facts as they stand now indicate otherwise.  Cadlerock's judgment lien is against Sam only; the judgment lien does not attach to Melissa's property interests because Cadlerock's lien against her was discharged in her Chapter 7 bankruptcy case.  There is no dispute that neither Sam nor Melissa has taken any affirmative steps to claim a homestead exemption.  Sam never responded to Cadlerock's Motion for Partial Summary Judgment and, therefore, never contested Cadlerock's claim that Sam has not yet invoked the exemption.  Melissa filed a separate response to Cadlerock's Motion in which she stated she "neither invokes nor waives any right she may have to invoke the homestead exemption pursuant to Ark. Cod

9

§ 16-66-210 as may be required by statute." (Doc. 76, p. 2). The law is clear that "[o]nce the property is occupied as a homestead, nothing more need be done to give the debtor the right to claim the personal privilege against a judgment creditor's sale." *Tri-State Delta Chems., Inc. v. Wilkison*, 75 Ark. App. 140, 142 (2001). But having the right to claim a homestead is not the same as claiming it. As the facts stand now, the homestead exemption has not been invoked—though, it appears, that could change between now and the date the home is sold and a suit brought for possession. *See* Ark. Code Ann. § 16-66-212(b). [3]

The United States contends that Sam and Melissa need not do anything to claim the exemption and have already claimed it, despite Sam's silence on the matter and Melissa's insistence that she *has not*, in fact, invoked her right to the exemption. According to the Homestead Exemption Act, the homestead of any married resident "shall not be subject to the lien of any judgment," Ark. Code Ann. § 16-66-210. However, for the exemption to apply, there must be sufficient proof that the homeowner is actually occupying the home as a residence. *Id.* In fact, the Act sets out a series of steps the homeowner must undertake in order to invoke the exemption. For example, the Act states that when a resident homeowner

> desires to claim any of the exemptions provided by law, he or she shall prepare a schedule, verified by affidavit, of all his or her property. This schedule shall include moneys, rights, credits, and choses in action held by himself or herself or others for him or her and specifying the particular

---

[3] Cadlerock concedes this point. *See* Doc. 87, p. 2 ("It may well be that the Weathers could carry their burden of establishing the homestead exemption for the property at issue here, should they eventually attempt to invoke it, but the point at this stage is that predicate facts for the exemption (including the Weathers' good faith intention to occupy the property as a homestead) do not exist in the record.").

property which he or she claims as exempt under the provisions of the Arkansas Constitution, Article 9.

Ark. Code Ann. § 16-66-211(a)(1).  Then,

> [a]fter giving five (5) days' notice in writing to the opposing party or his or her agent or attorney, the resident claiming the exemption shall file the schedule with the judge or clerk issuing the execution or other process or attachment.

*Id.* at (a)(2).  And after all that,

> [a] hearing shall be ordered by the court or judge issuing the process if, within five (5) days after receiving the notice required to be given by the person claiming the exemption, the party in whose favor the process issued files a request for a hearing with the judge or clerk of the court. If after the hearing, either in open court or by the judge in vacation, the claim of exemption is determined to be valid, then supersedeas shall issue, staying any sale or further proceeding under the execution, process, or attachment against the property described in the schedule, and claimed as exempted, and by returning the property to the defendant.

*Id.* at (a)(3)–(4).  It follows that since none of the above actions have taken place, Sam and Melissa have not yet claimed the homestead exemption.

Certainly, a homeowner who is entitled to claim a homestead exemption may elect to forego the benefit.  Arkansas law recognizes that  a homeowner may terminate his or her homestead rights by abandoning the premises or by executing a release or waiver. *See Lambert v. Childs*, 235 Ark. 714, 717–18 (1962) (noting that a married resident of a home abandoned it, which meant her homestead rights had been terminated).  Though it is true that Sam and Melissa may yet invoke their homestead rights, they have not done so as of the date of this Order.  Moreover, even if Sam and Melissa indicated they intended to invoke their rights, "[m]ere notice by the debtor that he intend[s] to claim exemptions [does] not satisfy the statute."  *Andrews v. Briggs*, 158 S.W.2d 269, 271 (Ark.

11

1942).   The Homestead Act requires completion of an affirmative act.   *See Griffin v. Puryear-Meyer Grocery Co.*, 151 S.W.2d 656, 658 (Ark. 1941).

Therefore, the Court makes the finding in view of the undisputed facts at this point in the proceedings that Cadlerock has a first-priority lien on Sam's interest in the residential property described in Count IV of the Amended Complaint.[4]

## B.    The United States' Motion

### i.    *Melissa's Affirmative Defense under 26 U.S.C. § 6015*

A husband and wife who file a joint federal income tax return are jointly and severally liable for the tax due on their combined incomes. However, 26 U.S.C. § 6015(b)

---

[4] The United States suggests that perhaps Sam and Melissa had no meaningful opportunity to assert their homestead exemption rights in the instant lawsuit—or otherwise—because Cadlerock never filed a crossclaim or counterclaim against them "for lien enforcement" in these proceedings.  (Doc. 74, p. 6).  The Court disagrees.  The plain language of the Homestead Act states exactly what the homeowner must do to claim an exemption when a lien is perfected, and, here, the lien against Sam and Melissa was perfected in 2009.  Melissa was discharged from the lien in bankruptcy in 2009, but the perfected lien remained enforceable against Sam.  Neither Sam nor Melissa must wait for Cadlerock to file a legal claim against them before they may invoke the homestead exemption.  They were free to invoke it at any time after they were on notice that any judgment lien had been perfected.

In the alternative, the United States appeals to the Court's common sense by arguing "it stands to reason" that the homestead exemption may be claimed by the United States on Sam and Melissa's behalf. (Doc. 74, p. 6).  First, the Court disagrees it should "stand to reason" that the federal government may claim a state constitutional right available only to Arkansas homeowners.  A homeowner still bears the burden of proof—although a very minimal one—that he or she is entitled to claim the exemption, i.e., by demonstrating proof of marriage and actual occupancy.  Second, Arkansas Code § 16-66-211 requires the homeowners to file an affidavit swearing to the fact that they are entitled to claim the exemption.  Though it is possible, if not likely, that Sam and Melissa are entitled to claim this exemption, the United States lacks the legal authority to swear out an affidavit confirming the predicate facts on their behalf. Furthermore, the United States' reliance on *United States v. Rogers*, 461 U.S. 677 (1983), is inapposite.  This case does not stand for the proposition that the United States may invoke the homestead exemption on Sam and Melissa's behalf.  The *Rogers* Court held that the federal government may seek the forced sale of property interests owed by a delinquent taxpayer under 26 U.S.C. § 7403—

provides that, in certain circumstances, an "innocent spouse" may be relieved of federal income tax liability, including interest and penalties. To be entitled to innocent spouse relief under § 6015(b), the claimant must satisfy several prerequisites, including proving that she did not know, nor had reason to know, that the joint tax return she filed with her husband contained an erroneous understatement and proving that it would be inequitable to hold her liable for the jointly owed deficiency.

The United States contends that Melissa can only raise the defense under § 6015 in the Tax Court, which has exclusive jurisdiction to determine whether the defense applies. The United States also argues that Melissa had two years from the time she first received notice of the federal tax liens filed against her to assert this affirmative defense (by filing Form 8857 with the IRS), which means that, at this point, she has lost her opportunity to assert it.[5] Melissa rejects this framework and argues that the tax

---

even when an innocent, non-delinquent third party occupied the home under a state homestead exemption. *See id.* at 700. In the case at bar, there are three distinguishing circumstances: no one has exercised or invoked the homestead exemption; the United States is not the only party with a lien interest in Sam and Melissa's home; and other creditors perfected their lien interests *before* the United States did. Hypothetically, if both Sam and Melissa chose to abandon the home tomorrow and forego their homestead rights, it does not follow that the United States could argue its lien encumbering the home was still superior to Cadlerock's and the Fowlers' because Sam and Melissa were, at one time, entitled to claim a homestead exemption.

The United States' argument also misses the larger, overriding point here. Even if the United States is successful in foreclosing its tax lien, its interest in the property will remain subject to the interest of any superior lienholder, including Cadlerock. *See United States v. McDermott*, 507 U.S. 447, 449 (1993) ("Federal tax liens do not automatically have priority over all other liens. Absent provision to the contrary, priority for purposes of federal law is governed by the common-law principle that the first in time is the first in right." (internal quotation and citation omitted)); 26 U.S.C. § 6323 (noting that tax liens are subordinate to previously perfected security interests in property).

[5] The United States contends, and Melissa does not dispute, that she received notification of a tax levy as early as August 12, 2019, which is more than two years ago. *See* Doc. 62-12.

assessments against her are invalid to begin with.  Should the factfinder conclude otherwise, only then then will she request innocent spouse relief under § 6015.

The United States does not attack Melissa's § 6015 defense on the merits. Instead, its Motion raises purely jurisdictional issues, including:  (1) whether this Court has jurisdiction to hear the defense *de novo* in this proceeding; (2) whether Melissa still has time to raise the defense administratively before the IRS and the Tax Court if this Court lacks jurisdiction to consider it; and (if there is still time to pursue the defense in another forum) (3) whether this Court should stay all proceedings against Melissa in the meantime.

 Having considered the briefing and all relevant caselaw, the Court finds it lacks jurisdiction to consider Melissa's § 6015 defense. Though there is little circuit guidance on this topic, multiple district courts have weighed in.  This Court concurs with their reasoning and conclusions.  A representative case is *Chandler v. United States*, where the District Court for the Northern District of Texas explained the following:

> To seek relief as an innocent spouse, the party must file Form 8857 with the IRS . . . . The Secretary of the Treasury then decides whether to grant or deny equitable relief and issues the party a decision letter . . . . If unsatisfied with the Secretary's decision, or if the Secretary fails to give notice of a decision within six months after receiving the request for review, the requesting spouse may petition the Tax Court to review the decision, "[i]n addition to any other remedy provided by law." 26 U.S.C. § 6015(e)(1)(A). If the Tax Court upholds the denial of the request, the United States Courts of Appeals then have exclusive jurisdiction to review the Tax Court's decision. *See* 26 U.S.C. § 7482(a)(1).

338 F. Supp. 3d 592, 602 (N.D. Tex. 2018).  Other district courts employ similar reasoning to reach the same conclusion.  *See, e.g.*, *United States v. Stein*, 2015 WL 5943441, at *3 (W.D. Ky. Oct. 13, 2015) ("Certainly no part of § 6015 confers jurisdiction to the federal district courts to determine innocent spouse claims in the first instance."); *United States*

*v. Elman*, 2012 WL 6055782, at *4 (N.D. Ill. Dec. 6, 2012) ("In summary, exclusive jurisdiction over Ms. Elman's innocent spouse defense under § 6015(f) lies with the Tax Court."); *United States v. Popowski*, 2012 WL 6085138, at *1 (D.S.C. Dec. 6, 2012) ("[T]he 'innocent spouse exception' . . .  may only be heard by the Tax Court and may not be raised here."); *United States v. LeBeau*, 2012 WL 835160, at *3 (S.D. Cal. Mar. 12, 2012) ("[T]he district court has no jurisdiction to decide an innocent spouse claim."); *United States v. Boynton*, 2007 WL 737725, at *3 (S.D. Cal. Feb. 1, 2007) ("[I]n an action such as the instant one, where the United States initiates a suit to reduce assessments to judgment, § 6015 contains no express provision granting District Court jurisdiction to decide the innocent spouse issue.").   The § 6015 defense is dismissed for lack of jurisdiction.

Finally, as to Melissa's request that these proceedings be stayed to permit her time to file an administrative claim with the IRS, such a stay would be exceedingly inefficient. Moreover, Melissa has yet to pursue the defense before the IRS, and it appears that the time to raise the defense has passed.  *See* C.F.R. § 1.6015-5(b) (noting that to request innocent spouse relief under the provisions of § 6015(b), (c), and (f), "a requesting spouse must first file Form 8857 or other similar statement with the Internal Revenue Service *no later than two years from the date of the first collection activity against the requesting spouse* . . . , with respect to the joint tax liability") (emphasis added); *Lantz v. C.I.R.*, 607

F.3d 479, 482–83 (7th Cir. 2010) (rejecting argument that equitable relief under § 6015(f) carries with it a ten-year limitations period, as opposed to a two-year period).

### ii.   Request for Judgment Against Sam as to Count III

Count III of the Amended Complaint asks the Court to enter judgment against Sam for a penalty associated with his failure to pay the IRS all payroll taxes that Haz-MERT withheld from its employees' paychecks.  Because an employer is tasked with holding these taxes in trust for the government, the taxes are commonly known as "trust fund taxes," and the employer's failure to pay them over to the government results in a "trust fund recovery penalty."  In *United States v. Bisbee*, 245 F.3d 1001, 1005 (8th Cir. 2001), the Eighth Circuit explained both the purpose of trust fund taxes and the consequences that would befall those who failed to pay them:

> Every employer is required to deduct and withhold federal income tax and Federal Insurance Contributions Act (FICA) tax from employees' wages as and when they are paid, I.R.C. §§ 3102 (FICA) and 3402 (income tax), and to hold the amounts withheld in trust for the United States. I.R.C. § 7501. These taxes are commonly referred to as trust fund taxes. *Slodov v. United States,* 436 U.S. 238, 243, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978). Because the employer is liable for payment of the taxes withheld, the employee is credited with the payment when it is withheld, whether the government actually receives the payment or not. *Slodov,* 436 U.S. at 243, 98 S.Ct. 1778; *Olsen v. United States,* 952 F.2d 236, 238 (8th Cir. 1991); I.R.C. § 3403. If the employer is a corporation and fails to make the required payment, the United States could lose the revenue. *Olsen,* 952 F.2d at 238. In order to protect against such losses, the persons responsible for ensuring that the trust fund taxes are paid who willfully fail to do so may be held personally liable. I.R.C. § 6672; *Olsen,* 952 F.2d at 238.
>
> The IRS is authorized to assess and collect a trust fund recovery penalty from any officer or employee of any corporation who is responsible for collecting, accounting for, and paying over any tax imposed by the Internal Revenue Code and who willfully fails to do so. I.R.C. §§ 6671(b) and 6672. The amount of the penalty for which the person can be held personally liable is equal to the total amount of the tax not accounted for and paid over. I.R.C. § 6672(a).

Under 26 U.S.C. § 6672, an individual is liable for failure to pay trust fund taxes if he: (1) is considered a "responsible person" as defined by law and (2) willfully fails to pay over withholding taxes to the United States. *Keller v. United States*, 46 F.3d 851, 854 (8th Cir. 1995). More than one person may be considered "responsible" for paying a company's trust fund taxes, and "[i]t is not necessary that a responsible person be an actual disbursing officer." *Id*. at 854. Furthermore, if a corporate leader otherwise qualifies as a responsible person under the statute, he "does not avoid liability under section 6672 by delegating his authority to another." *Id.*

### a. Responsible Person Analysis

Under § 6672, a person is "responsible" for paying trust fund taxes if he had "the status, duty and authority to avoid the corporation's default in collection or payment of the taxes." *Oppliger v. United States*, 637 F.3d 889, 893 (8th Cir. 2011) (quotation marks and citation omitted). Courts consider a number of non-exclusive factors when determining whether someone is "responsible" under the statute, including whether the individual is:

(1) an officer or board member of the company;

(2) an owner of substantial stock in the company;

(3) a manager of day-to-day operations;

(4) one who is authorized to hire or fire employees;

(5) one who is authorized to make decisions as to disbursement of funds and payment of creditors;

(6) one who controls bank accounts and disbursements of records; and

(7) one who is authorized to sign checks.

*Id.*

During Sam's deposition, he made a number of admissions regarding his role at Haz-MERT.  Those admissions, taken together, satisfy the factors above and show that Sam was a person "responsible" for insuring that Haz-MERT's trust fund taxes were properly paid to the IRS.  However, in response to the United States' Motion for Partial Summary Judgment, Sam submitted a declaration that sought to qualify—or outright disclaim—many of these admissions.  He now maintains that during his deposition, he sometimes "misunderstood what the government was asking." (Doc. 92-5, p. 2).  He also explains now that Haz-MERT's failure to pay over trust fund taxes was not his fault, but the fault of his "bookkeepers and office staff."  *Id.* at p. 7.  He even claims he "was unaware that Haz-MERT lacked funds to pay its payroll taxes."  *Id.*  He also insists he never knew "that any of the payments to the IRS were dishonored" due to lack of funds or "that Haz-MERT had incurred unpaid liabilities in conjunction with its employment taxes for the periods at issue, until right before Haz-MERT declared bankruptcy in 2009."  *Id.* at p. 8.

"[A] properly supported motion for summary judgment is not defeated by self-serving affidavits." *Gander Mountain Co. v. Cabela's, Inc.*, 540 F.3d 827, 831 (8th Cir. 2008) (quoting *Conolly v. Clark*, 457 F.3d 872, 876 (8th Cir. 2006)). Rather, the plaintiff "must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor." *Davidson & Assocs. v. Jung*, 422 F.3d 630, 638 (8th Cir. 2005).  Here, the Court finds Sam's post-deposition declaration to contain self-serving statements that often contradict the clear testimony he gave under oath in his deposition. Moreover, it is implausible for Sam to claim that he answered questions a certain way during his deposition because he did not understand the questions and had no opportunity to seek clarification.  The deposition transcript reveals that Sam was not shy

about asking the United States' attorney to "redo [her] question" when he did not understand.  *See* Doc. 97-1, p. 14.  He also proactively informed counsel that he needed to clarify previous answers and then proceeded to do so.  *See, e.g., id.* at p. 34.  And at the end of his deposition, he reserved the right to review it and submit any errata sheets if necessary. *Id.* at p. 38 ("I want to review it and sign.  Glad you brought that up.").  The Court therefore credits the answers Sam gave during his deposition and does not rely on the self-serving *post hoc* rationales he offers in his subsequent declaration.

Sam admitted during his deposition that he served as president of Haz-MERT and was one of seven owners of Haz-MERT stock.  (Doc. 97-1, p. 6).  When he started the business in 1993, he performed a lot of work in the field and was in the office approximately a couple of times per week.  (Doc. 92-2, p. 2).  Sometime around 2007, at the height of the business's success, there were 36 employees.  *Id.*  Sam and his vice president, Davina Collins, were the only officers with authority to hire and fire employees. *Id.* at p. 3.  The business had three checking accounts, and Sam was a signatory on all three.  *Id.* at p. 4.  These accounts, as described in detail by Sam during his deposition, included a petty cash account, a payroll account, and a general account.  *Id.*  All payroll checks contained Sam's signature.  He would sign checks personally if he was in the office.  *Id.*  Sam explicitly authorized either his bookkeeper or vice president to use his signature stamp to sign checks when he was not in the office.  *Id.* at pp. 4–5.  Sam also testified that he knew payroll taxes were paid quarterly, though he tasked his bookkeeper with preparing the tax returns for him to sign.  *Id.* at pp. 14–16.  His signature appeared on all quarterly trust fund tax returns.  Given these facts, the Court finds there is no genuine, material dispute that Sam was a "responsible person" under § 6672.

### b.  Willful Failure to Pay

Willfulness is generally a question of fact; but if a responsible person was aware that his company failed to pay taxes, and he nonetheless paid other creditors instead of the government, his actions are considered willful as a matter of law. *Honey v. United States,* 963 F.2d 1083, 1087 (8th Cir. 1992) (quotation omitted). Willfulness is also established when a responsible person acts with a "reckless disregard of a known or obvious risk that trust funds may not be remitted to the government." *Id.* (quotation marks and citation omitted).  "Reckless conduct includes a failure to investigate or to correct mismanagement" after the responsible person knows that taxes have not been paid appropriately.  *Keller*, 46 F.3d at 854–55.

Sam claims he did not know Haz-MERT owed trust fund taxes until July 2009, around the time Haz-MERT filed for bankruptcy. That claim, however, is flatly contradicted by the evidence, and Sam can offer no proof to support his alleged lack of knowledge. The first piece of evidence that proves that knowledge is the IRS's Integrated Collection Systems ("ICS") history transcript for Haz-MERT (Doc. 62-23).[6]  The ICS form documents Sam's contact with the IRS in January 2006 concerning trust fund tax penalties owed by Haz-MERT at the time.  During this contact with the IRS, Sam tacitly admitted that he was a "responsible person" because he reached out to the IRS on Haz-MERT's behalf and promised to pay the company's trust fund tax liability.[7]

---

[6] Senior counsel for the IRS affirms this document "is kept in the course of regularly conducted IRS activities."  (Doc. 62-2, p. 3).

[7] Sam does not dispute the accuracy of the ICS form.  He agrees he had contact with an IRS employee in 2006, as the form indicates, and the employee counseled him on how to pay (or request abatement of) a penalty owed for Haz-MERT's trust fund taxes.  Sam objects to the Court's reliance on the form, arguing it is irrelevant because "the contact had to do with tax periods prior to the periods at issue herein" and concerned "another

The next piece of evidence is Form 4180, which is titled "Report of Interview with Individual relative to Trust Fund Recovery Penalty or Personal Liability for Excise Taxes." (Doc. 62-5).  That form records the oral statements Sam gave to an IRS investigator on March 20, 2009.  One question the interviewer asked Sam was, "When and how did you first become aware of the delinquent taxes?" *Id*. at p. 4.  Sam's recorded response was, "At time deposits due."  *Id*.  Sam signed this form and, in doing so, verified that all his responses noted on the form were "true, correct, and complete."  *Id*.

Next, during Sam's deposition, he agreed that by February 2007—a little more than a month before the earliest tax deficiency noted in Count III—he was aware that Haz-MERT had sustained a significant financial loss when a project valued at $750,000 was cancelled.  Sam testified that as a result of that loss, Haz-MERT began falling behind on paying creditors, including the Fowlers, the State of Arkansas, and the IRS.  (Doc. 62-22, pp. 8–10).  Sam's admission here establishes his knowledge that prior to the time-period in Count III, his company was in serious financial difficulty, he was behind in paying

---

entity"—and not Haz-MERT.  (Doc. 93, p. 14). Sam's relevancy objection is overruled. First, he offers no proof that his contact with the IRS concerned another entity. The form itself clearly references Haz-MERT and no other company.  The form is also relevant in that it tends to disprove Sam's contention that he did not involve himself in Haz-MERT's IRS matters, particularly payroll taxes, and instead deferred to his bookkeeper on all things payroll-related.  According to the ICS form, Sam was well aware in early 2006 that Haz-MERT owed trust fund taxes, and he—and not his bookkeeper—personally called the IRS about the debt, just as a "responsible person" under § 6672 would do.  Sam told the IRS employee at that time that he "had no questions [about the trust fund tax penalties] as they have been explained in the past," and he expected "he could make a large down payment today and full [sic] pay within 2 weeks."  (Doc. 62-23, p. 2). Of course, what the ICS form reveals about the nature of Haz-MERT's financial difficulties in 2006 is not particularly relevant now.  What *is* relevant is how informed Sam was about financial matters in his office in 2006, particularly with regard to trust fund taxes.  The ICS form also tends to show that Sam's more recent claims of financial ignorance, as noted in his declaration, are self-serving and incredible.

the company's creditors, and the company owed money to the IRS.  Sam also admitted in his deposition that during this same time period, March 2007 to July 2009, he elected to continue paying his employees—including himself—as well as other company creditors. *Id.* at pp. 10, 26; *see also* Doc. 62-24.

Although Sam claims he trusted that all payroll taxes were being paid at this time and "relied on Haz-MERT's bookkeeper and office staff" to keep up with the required payments, his alleged willful ignorance of the taxes owed does not excuse him from personal liability as a "responsible person" under § 6672.[8]  Sam either knew that trust fund payments "may not [have] be[en] remitted to the government," or he was aware of "an obvious risk" of incomplete payments.  *Honey*, 963 F.3d at 1087.  His decision to bury his head in the sand and hope his bookkeeper would be blamed for these failures was at the very least reckless and, therefore, willful as a matter of law.

The record reveals that Sam had actual notice that Haz-MERT was behind on its trust fund payments throughout the period specified in Count III.  The following facts are undisputed:

- Haz-MERT filed quarterly tax returns using Form 941 for all tax periods at issue, and Sam's signature appears on these returns.

---

[8] Another piece of evidence that tends to disprove Sam's declaration of financial ignorance with respect to trust fund taxes is found in the deposition of Haz-MERT's vice president, Ms. Collins—which Sam attached to his response to the United States' Motion. Ms. Collins testified that the bookkeeper would ordinarily calculate the amount of trust fund taxes Haz-MERT owed "and then prepare the checks or the paperwork and give those to [Sam] Shannon for his signature and approval."  (Doc. 92-4, p. 4).  When Ms. Collins was asked "who was responsible for actually turning over or paying those withheld taxes over to the United States," she answered, "I assume it was [Sam] Shannon Weathers . . . [s]ince he was responsible for everything else."  *Id.*

- Each tax return reflected the trust fund tax balance that was due and owing.

- On April 30, 2007, Haz-MERT filed its Form 941 tax return for the tax period ending March 31, 2007, reflecting a balance owed of $44,095.75. A payment was submitted with the tax return which was subsequently dishonored for insufficient funds. (Doc. 62-15).[9]

- On February 22, 2008, Haz-MERT untimely filed its Form 941 tax return for the tax period ending June 30, 2007, reflecting a balance of $43,623.47. Although the tax return reflected a balance due, there was no payment submitted with the tax return. (Doc. 62-16).

- On December 6, 2007, Haz-MERT untimely filed its Form 941 tax return for the tax period ending September 30, 2007, reflecting a balance of $48,104.88. Although the tax return reflected a balance due, there was no payment submitted with the tax return. (Doc. 62-17).

- On January 31, 2008, Haz-MERT filed its Form 941 tax return for the tax period ending December 31, 2007, reflecting a balance of $46,795.24. Although the tax return reflected a balance due, there was no payment submitted with the tax return. (Doc. 62-18).

---

[9] Sam generally "disputes that the payments [he made to the IRS] were dishonored," (Doc. 93, p. 11), but he fails to "discard the shielding cloak of formal allegations and meet proof with proof," as is required on summary judgment. *See Fatemi v. White*, 775 F.3d 1022, 1046 (8th Cir. 2015). In other words, he offers no proof to show the checks were *not* dishonored and that the IRS actually cashed the checks—which, surely, he could do by attaching a copy of the cancelled checks. Instead, he attaches a copy of a cashier's check stub that Haz-MERT directed to the IRS for the payment of certain trust fund taxes. *See* Doc. 92-7. Obviously, this check stub does not prove the check was honored by the bank.

- On October 2, 2008, Haz-MERT untimely filed its Form 941 tax return for the tax period ending March 31, 2008, reflecting a balance of $38,646.49. Although the tax return reflected a balance due, there was no payment submitted with the tax return. (Doc. 62-19).

- On September 11, 2008, Haz-MERT untimely filed its Form 941 tax return for the tax period ending June 30, 2008, reflecting a balance of $28,021.99. A payment was submitted with the tax return which was subsequently dishonored for insufficient funds. (Doc. 62-20).

- On January 27, 2009, Haz-MERT untimely filed its Form 941 tax return for the tax period ending September 30, 2008, reflecting a balance of $38,499.22. Although the tax return reflected a balance due, there was no payment submitted with the tax return. (Doc. 62-21).

- On January 31, 2009, Haz-MERT filed its Form 941 tax return for the tax period ending December 31, 2008, reflecting a balance of $35,013.50. Although the tax return reflected a balance due, there was no payment submitted with the tax return. (Doc. 62-13).

- On April 30, 2009, Haz-MERT filed its Form 941 tax return for the tax period ending March 31, 2009, reflecting a balance of $27,437.92. A payment was submitted with the tax return which was subsequently dishonored for insufficient funds. (Doc. 62-14).

- During Sam's deposition, he was shown copies of all tax returns described above, and he testified that he either physically signed each

Form 941 or authorized that his signature stamp be used on each form.

(Doc. 62-22, pp. 11–21).

The Court therefore concludes there is no genuine, material dispute of fact that Sam's action or inaction with respect to the payment of trust fund tax liabilities was willful. He is therefore personally liable for the taxes owed.

### c.  Amount Owed

As liability on Count III has been established, the only remaining question is the amount of the judgment.  Sam contends that Haz-MERT made some payments toward its trust fund tax debt, but those payments were not applied "as instructed."  (Doc. 92-5, p. 7).  Sam specifically lists ten separate payments that were not properly credited to the tax debt owed. *See* Doc. 91, p. 10.

In *David E. Watson, P.C. v. United States*, the Eighth Circuit explained that "[w]hen the IRS determines that a taxpayer owes the Federal Government unpaid taxes, the 'assessment is entitled to a legal presumption of correctness.'" 668 F.3d 1008, 1016 (quoting *United States v. Fior D'Italia, Inc.*, 536 U.S. 238, 242 (2002)). The taxpayer has the burden of proving the IRS's assessment was wrong. *Id.*

The IRS submitted official Certificates of Assessments (Form 4340) (Docs. 62-26–62-34) and Account Transcripts (Docs. 62-13–62-21) reflecting payments received and credited toward Haz-MERT's trust fund tax penalties.  The United States asserts that as of June 1, 2022, the unpaid balance of the assessments owed by Haz-MERT for trust fund tax penalties was $283,375.96, plus interest.  Sam claims that payments on April 30, 2007, for $44,095.75; August 11, 2008, for $5,689.52; and April 29, 2009, for $27,437.92 were valid and should have been credited to Haz-MERT's balance owed.  The United

States responds that, according to its records, those payments were dishonored and returned due to insufficient funds.  Sam provides no proof that the three payments were honored by the IRS and cashed out of Haz-MERT's bank account.  *See* Docs. 92-7, 92-15, 92-16.  Next, the Account Transcripts contain no mention of the payments Sam alleges were made on June 1, 2007, for $45,238.45; November 2, 2007, for $40,545.12; December 19, 2007, for $30,163.97; and January 3, 2008, for $41,000.00.  Sam provides no proof that these checks were electronically transmitted/mailed and/or cashed by the IRS.  *See* Docs. 92-8, 92-9, 92-11, and 92-13.   Finally, Sam complains that payments made on September 11, 2007, for $7,559.76; November 14, 2007, for $16,631.64; and May 16, 2009, for $13,910.11 were never credited to Haz-MERT's account.  The Account Transcript shows otherwise.  *See* Docs. 62-17, p. 2; 62-18, p. 2; 62-20, p. 2.

As there is no genuine, material dispute of fact as to the tax penalty owed by Sam on Count III, the United States will be granted judgment against him in the amount of $283,375.96, plus interest accruing from June 1, 2022.

## B.  CONCLUSION

**IT IS THEREFORE ORDERED** that Cadlerock Joint Venture, LP's Motion for Partial Summary Judgment (Doc. 47) is **GRANTED**. The United States' Motion for Partial Summary Judgment (Doc. 62) is also **GRANTED**.  This case remains set for trial.

**IT IS SO ORDERED** on this 10th day of August, 2022.

                                   _____
                                   TIMOTHY L. BROOKS
                                   UNITED STATES DISTRICT JUDGE